08C 2702

**UNITED STATES DISTRICT COURT**
**Northern District of California**
**450 Golden Gate Avenue**
**San Francisco, California 94102**

www.cand.uscourts.gov

Richard W. Wieking
Clerk

General Court Number
415.522.2000

May 23, 2008

Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

**FILED**

JUN 0 2 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

RE: CV 08-01070 MEJ  LOUIS FUENTES-v-BAYER CORPORATION

Dear Clerk,

Pursuant to an order transferring the above captioned case to your court, transmitted herewith are:

☒    All docket entries/documents.

☒    Transferral Order.

Please acknowledge receipt of the above documents on the attached copy of this letter.

Sincerely,
RICHARD W. WIEKING, Clerk

by:  Simone Voltz
Case Systems Administrator

Enclosures
Copies to counsel of record

ADRMOP, CLOSED, E-Filing, TRANSF

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:08-cv-01070-MEJ
## Internal Use Only

Fuentes v. Bayer Corporation et al
Assigned to: Magistrate Judge Maria-Elena James
Cause: 28:1332 Diversity-Personal Injury

Date Filed: 02/22/2008
Date Terminated: 05/14/2008
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

**Plaintiff**

**Louis Fuentes**
represented by **Elizabeth Joan Cabraser**
Lieff, Cabraser, Heimann & Bernstein
LLP
Embarcadero Center West
275 Battery Street
30th Floor
San Francisco, CA 94111
415/956-1000
Fax: 415-956-1008
Email: ecabraser@lchb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heather Anne Foster**
Lieff Cabraser Heimann & Bernstein
LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
415-956-1000
Fax: 415-956-1008
Email: hfoster@lchb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lexi Joy Hazam, Esq.**
Lieff Global LLP
275 Battery Street
30th Floor
San Francisco, CA 94111-3339
415-788-8000

Fax: 415-788-8002
Email: lhazam@lieffglobal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paulina DoAmaral**
Lieff, Cabraser, Heimann & Bernstein
780 Third Avenue
48th FLoor
New York, NY 10017
212-355-9500
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven Eliott Fineman**
780 Third Avenue
48th Floor
New York, NY 10017
212-355-9500
Fax: 212-335-9592
Email: sfineman@lchb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bayer Corporation**

**Defendant**

**Baxter Healthcare Corporation**

**Defendant**

**Armour Pharmaceutical Company
Inc**

**Defendant**

**Alpha Therapeutic Corporation**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/22/2008 | 1 | COMPLAINT /Issued summons against Bayer Corporation, Baxter Healthcare Corporation, Armour Pharmaceutical Company Inc, Alpha Therapeutic Corporation ( Filing fee $ 350, receipt number 34611016128.). Filed byLouis Fuentes. (ga, COURT STAFF) (Filed on 2/22/2008) (Additional attachment(s) added on 3/31/2008: # 1 Civil Cover Sheet) (ga, COURT STAFF). (Entered: 02/26/2008) |
| 02/22/2008 | 2 | ADR SCHEDULING ORDER: Case Management Conference set for |

| | | |
|---|---|---|
| | | 5/29/2008 10:00 AM. Case Management Statement due by 5/22/2008.. Signed by Judge Maria-Elena James on 2/22/08. (Attachments: # 1 Judge Standing Order, # 2 Court Standing Order, # 3 Consent/Decline Form)(ga, COURT STAFF) (Filed on 2/22/2008) (Entered: 02/26/2008) |
| 02/22/2008 | | CASE DESIGNATED for Electronic Filing. (ga, COURT STAFF) (Filed on 2/22/2008) (Entered: 02/26/2008) |
| 05/08/2008 | 3 | CERTIFICATE OF SERVICE by Louis Fuentes re 1 Complaint, *Proof of Service Summons & Complaint - Baxter Healthcare Corporation* (Foster, Heather) (Filed on 5/8/2008) (Entered: 05/08/2008) |
| 05/08/2008 | 4 | SUMMONS Returned Executed by Louis Fuentes. Bayer Corporation served on 3/14/2008, answer due 4/3/2008. *(Proof of Service Summons & Complaint)* (Foster, Heather) (Filed on 5/8/2008) (Entered: 05/08/2008) |
| 05/08/2008 | 5 | SUMMONS Returned Executed by Louis Fuentes. Alpha Therapeutic Corporation served on 3/14/2008, answer due 4/3/2008. *(Proof of Service Summons & Complaint)* (Foster, Heather) (Filed on 5/8/2008) (Entered: 05/08/2008) |
| 05/08/2008 | 6 | SUMMONS Returned Executed by Louis Fuentes. Armour Pharmaceutical Company Inc served on 3/14/2008, answer due 4/3/2008. *(Proof of Service Summons & Complaint)* (Foster, Heather) (Filed on 5/8/2008) (Entered: 05/08/2008) |
| 05/08/2008 | 7 | SUMMONS Returned Executed by Louis Fuentes. Baxter Healthcare Corporation served on 3/14/2008, answer due 4/3/2008. *(Proof of Service Summons & Complaint)* (Foster, Heather) (Filed on 5/8/2008) (Entered: 05/08/2008) |
| 05/14/2008 | 8 | ORDER TRANSFERRING CASE to the Northern District of Illinois (per CTO-103). (sv, COURT STAFF) (Filed on 5/14/2008) (Entered: 05/23/2008) |
| 05/23/2008 | 9 | CLERK'S NOTICE of case transferred electronically to the Northern District of Illinois 8 (sv, COURT STAFF) (Filed on 5/23/2008) (Entered: 05/23/2008) |

Inasmuch as no objection is
pending at this time, the
stay is lifted.

MAY - 7 2008

CLERK'S OFFICE
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

**JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

**APR 2 1 2008**

FILED
CLERK'S OFFICE

**UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION**

FILED:  MAY 7, 2008
08CV2702      CEM
JUDGE GRADY

IN RE: "FACTOR VIII OR IX CONCENTRATE BLOOD
PRODUCTS" PRODUCTS LIABILITY LITIGATION
Louis Fuentes v. Bayer Corp., et al.,                    )
N.D. California, C.A. No. 3:08-1070 - 08cv2702  )

MDL No. 986

**CONDITIONAL TRANSFER ORDER (CTO-103)**

On December 7, 1993, the Panel transferred 27 civil actions to the United States District Court for
the Northern District of Illinois for coordinated or consolidated pretrial proceedings pursuant to 28
U.S.C. § 1407.  *See* 853 F.Supp. 454 (J.P.M.L. 1993).  Since that time, 263 additional actions have
been transferred to the Northern District of Illinois.  With the consent of that court, all such actions
have been assigned to the Honorable John F. Grady.

It appears that the action on this conditional transfer order involves questions of fact that are
common to the actions previously transferred to the Northern District of Illinois and assigned to
Judge Grady.

Pursuant to Rule 7.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199
F.R.D. 425, 435-36 (2001), this action is transferred under 28 U.S.C. § 1407 to the Northern District
of Illinois for the reasons stated in the order of December 7, 1993, and, with the consent of that court,
assigned to the Honorable John F. Grady.

This order does not become effective until it is filed in the Office of the Clerk of the United States
District Court for the Northern District of Illinois.  The transmittal of this order to said Clerk shall
be stayed 15 days from the entry thereof.  If any party files a notice of opposition with the Clerk of
the Panel within this 15-day period, the stay will be continued until further order of the Panel.

A CERTIFIED TRUE COPY

MAY - 7 2008

ATTEST
FOR THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

A TRUE COPY-ATTEST
MICHAEL W. DOBBINS, CLERK

By  S/WILLIE A. HAYNES
DEPUTY CLERK
U.S. DISTRICT COURT, NORTHERN
DISTRICT OF ILLINOIS

DATE: MAY 13, 2008



**COPY**

1   Elizabeth J. Cabraser (State Bar No. 83151, ecabraser@lchb.com)
    Heather A. Foster (State Bar No. 184353, hfoster@lchb.com)
2   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 30th Floor
3   San Francisco, CA  94111-3339
    Telephone:  (415) 956-1000
4   Facsimile:  (415) 956-1008

5   Attorneys for Plaintiffs

6   *Additional plaintiffs' counsel listed on signature page

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10  LOUIS FUENTES, a resident of Junction, Texas          Case No.

11                        Plaintiff,                       **COMPLAINT FOR 1070**
                                                          **DAMAGES AND**
12  v.                                                    **INJUNCTIVE RELIEF**

13  BAYER CORPORATION, an Indiana corporation,            Jury Trial Demanded
    successor to CUTTER BIOLOGICAL, a California
14  Corporation; BAXTER HEALTHCARE                        (1) Negligence
    CORPORATION, a Delaware corporation, and its         (2) Negligence Per Se
15  HYLAND DIVISION; ARMOUR PHARMACEUTICAL                (3) Fraudulent Omission and
    COMPANY, INC., a Delaware corporation and ALPHA           Concealment
16  THERAPEUTIC CORPORATION, a California                 (4) Breach of Implied Warranty
    corporation,
17
                          Defendants.
18

19  **I.    INTRODUCTION**

20          1.    Defendants manufactured blood products known as "Factor VIII" and

21  "Factor IX" for the treatment of hemophilia, and sold these products to people with hemophilia in

22  the United States and worldwide, despite knowledge that the products were manufactured from

23  sick, high-risk donors and/or known to be contaminated with the virus that causes Non-A, Non-B

24  Hepatitis (now known as "Hepatitis C" or "HCV").  Defendants knowingly declined to timely

25  pursue or adopt treatment and manufacturing practices that would have prevented the infection of

26  Plaintiff with HCV, as described in more detail below.  Defendants also continued selling old

27  stocks of products they knew to be contaminated with HCV even after they or others had

28  introduced safer products.  Plaintiff is a person with hemophilia who contracted HCV through use

750361.1                                          COMPLAINT FOR DAMAGES
                                                  AND INJUNCTIVE RELIEF

1   of Defendants' contaminated products. This complaint describes the factual predicate for

2   Plaintiff's infection: a pattern of foot-dragging, denial, and obfuscation by the pharmaceutical

3   companies on whom his health and well-being depended.

4        2.      Defendants manufactured HCV-contaminated blood factor products using

5   human plasma taken from thousands of paid donors, including populations then known to be at

6   high risk of carrying blood-borne diseases, such as urban homosexuals, prisoners, and intravenous

7   drug users. Defendants intentionally recruited urban homosexuals who had a history of viral

8   hepatitis as plasma donors, despite regulations prohibiting the use of such donors and despite

9   knowledge that the virus that causes HCV was a blood-borne disease prevalent in such

10  populations. Defendants continued using plasma taken from high-risk prison donors, even after

11  promising the FDA that they would cease doing so. Through their trade associations, Defendants

12  actively conspired to conceal these practices and to substantially delay product recalls and

13  implementation of safety measures.

14       3.      Defendants failed to fully and completely disclose the known risks of their

15  products, including the risk of HCV; failed to implement readily available screening tests that

16  would have prevented HCV by excluding contaminated plasma; failed to use available methods

17  of treating plasma to kill viruses, including treatment with solvents and/or detergents; and

18  concealed and affirmatively misrepresented the extent of the health dangers of the diseases caused

19  by the products. Defendants also continued to sell old stocks of product that had not been treated

20  even after introducing a safer treated product, including stocks that Defendants knew or had

21  reason to know were made from pooled blood contaminated with HCV.

22       4.      Defendants' efforts to maximize profits came at the expense of the health

23  and lives of thousands of people with hemophilia in the United States and worldwide who were

24  needlessly infected with HCV, including LOUIS FUENTES.

25  **II.    JURISDICTION AND VENUE**

26       5.      Plaintiff alleges an amount in controversy in excess of $75,000, exclusive

27  of interest and costs. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332

28  because there is complete diversity of citizenship between Plaintiff and Defendants.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

6.     Plaintiff is informed and believes and on such information and belief alleges that the conduct by Defendants that is relevant to the subject matter of this action took place primarily in their respective headquarters location and in other facilities within the States of California and Illinois, giving these states significant contacts to the claims asserted by Plaintiff and creating state interests such that the choice of either or each of these states' laws to govern the adjudication of this action is neither arbitrary nor fundamentally unfair.

III.   **PARTIES**

7.     Plaintiff LOUIS FUENTES, a resident of Junction, Texas, who has hemophilia. Plaintiff has already provided Defendant with a confidential Preliminary Patient Profile Form ("PPPF"), with beginning Bates number L-PPF 003600. The PPPF contains substantial additional information regarding Plaintiff's claim.

8.     Plaintiff was infected with HCV and experienced physical and emotional harm as a direct and proximate result of his use of Defendants' blood products.

9.     Plaintiff would not have chosen to be treated with Defendants' blood products, nor would have his guardians, had they known of or been informed by Defendants of the true risks of using those products or the nature of the sources of the products.

10.    Defendant CUTTER BIOLOGICAL ("CUTTER"), the predecessor of Miles, Inc., and Defendant BAYER, was a California corporation headquartered in Berkeley, California at all pertinent times. At all pertinent times CUTTER and its successors Miles, Inc. and BAYER regularly and systematically engaged in the harvesting and collection of human plasma and the processing, manufacturing, marketing, sales and distribution of factor concentrates produced from such plasma, to which Plaintiff was exposed and which contributed directly or indirectly to Plaintiff's infection with HCV.

11.    Defendant BAYER CORPORATION ("BAYER"), formerly Miles, Inc., is and was an Indiana corporation, authorized to do business in all 50 states and the District of Columbia. Miles, Inc. had its principal place of business operation in Elkhart, Indiana, while its successor BAYER has its principal place of business in Pennsylvania, with offices located at 100 BAYER Road, Pittsburgh, Pennsylvania 15205. At all pertinent times BAYER and its

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   predecessors Miles, Inc., and CUTTER regularly and systematically engaged in the harvesting

2   and collection of human plasma and the processing, manufacturing, marketing, sales and

3   distribution of factor concentrates produced from such plasma, to which Plaintiff was exposed

4   and which contributed directly or indirectly to Plaintiff's infection with HCV.

5          12.    Defendant BAXTER HEALTHCARE CORPORATION ("BAXTER") is a

6   Delaware corporation, authorized to do business in all 50 states and the District of Columbia, with

7   its principal place of business in Illinois, with offices located at One Baxter Parkway, Deerfield,

8   Illinois 60015.  At all times pertinent, Defendant BAXTER, and/or its HYLAND DIVISION, had

9   its main manufacturing plant in Glendale, California.  At all times pertinent, Defendant

10  BAXTER, and/or its HYLAND DIVISION, and/or its wholly owned subsidiaries Travenol

11  Laboratories, regularly and systematically engaged in the harvesting and collection of human

12  plasma and the processing, manufacturing, marketing, sale and distribution of FACTOR

13  CONCENTRATE products produced from such plasma, to which Plaintiff was exposed and

14  which contributed directly or indirectly to Plaintiff's infection with HCV.

15         13.    Defendant ARMOUR PHARMACEUTICAL COMPANY, INC.

16  ("ARMOUR") is a Delaware corporation, with its principal place of business in Pennsylvania,

17  with offices located at 500 Arcola Road, P.O. Box 1200, Collegeville, Pennsylvania, 19426-0107.

18  At all times pertinent,  ARMOUR regularly and systematically engaged in the harvesting and

19  collection of human plasma and the processing, manufacturing, marketing, sales and distribution

20  of factor concentrate products produced from such plasma, to which Plaintiff was exposed and

21  which contributed directly or indirectly to Plaintiff's infection with HCV.

22

23         14.    Defendant ALPHA THERAPEUTIC CORPORATION ("ALPHA") is a

24  California corporation, with its principal place of business in California, with offices at 5555

25  Valley Boulevard, Los Angeles, California 90032.  At all times pertinent, Defendant has been

26  regularly and systematically engaged in the harvesting and collection of human plasma, and the

27  processing, manufacturing, marketing, sale and distribution of factor concentrate products

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1  produced from such plasma, to which Plaintiff was exposed and which contributed directly or

2  indirectly to Plaintiff's infection with HCV.

3        15.    Defendants CUTTER, BAXTER, ARMOUR and ALPHA (hereinafter

4  collectively referred to as "Defendants"), acting on behalf of themselves and/or their predecessor

5  and/or successor corporations, collected, harvested and/or processed human plasma and/or

6  manufactured, marketed, sold and distributed factor concentrate products that were contaminated

7  with HCV.  In the alternative, one or more of said Defendants participated in the collection,

8  harvesting and/or processing of human plasma, and/or the manufacturing, marketing, distribution

9  and sale of factor concentrate products, that were contaminated with HCV; or assumed or became

10  responsible for, the liabilities of the Defendants and their predecessor or successor corporations

11  who did participate in the collection, harvesting and/or processing of human plasma, and/or the

12  manufacturing, marketing, distribution or sale of factor concentrate products, that were

13  contaminated with HCV, without limitation thereto.

14        16.    At all times herein mentioned, Defendants were fully informed of the

15  actions of their agents and employees, and thereafter no officer, director or managing agent of

16  Defendants repudiated those actions, which failure to repudiate constituted adoption and approval

17  of said actions, and Defendants thereby ratified those actions.

18  IV.    **FACTUAL ALLEGATIONS**

19        A.    **Hemophilia and Its Treatment**

20        17.    Hemophilia is an inherited condition that causes uncontrolled

21  hemorrhaging or bleeding.  Hemophilia results from a deficiency of blood components essential

22  for coagulation.  The most common form of the disease is hemophilia A, characterized by a lack

23  of a blood protein known as Factor VIII, which affects approximately one in 10,000 males.

24  Factor VIII is commonly called "AHF" or anti-hemophilic factor.  Hemophilia B is characterized

25  by absence of another blood protein, known as Factor IX, affecting about one in 40,000 males.

26  Plaintiff LOUIS FUENTES has severe hemophilia A.

27        18.    The treatment of hemophilia involves intravenous introduction, called

28  infusion, of the missing blood proteins required to stop bleeding.  The two most prevalent forms

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    of such treatment are cryoprecipitate and factor concentrates. Factor concentrates are the

2    products made by Defendants in this action. Cryoprecipitate is made by freezing plasma, the

3    fluid component of circulating blood in which various proteins, including Factor VIII and

4    Factor IX, are contained; thawing the frozen plasma; and isolating Factor VIII from the plasma

5    through centrifugal concentration. Cryoprecipitate is an effective therapeutic agent for patients

6    with hemophilia A. Hemophilia B has been effectively treated with the use of fresh frozen

7    plasma containing Factor IX. Cryoprecipitate and fresh frozen plasma are made from small

8    numbers of donors, who are generally unpaid volunteers.

9            19.    In the late 1960s to early 1970s, Defendants began to market factor

10    concentrates, which contained Factor VIII and Factor IX in higher concentrations than had been

11    available in either cryoprecipitate or fresh-frozen plasma. To produce factor concentrates,

12    Defendants mixed pools of plasma from five to over twenty thousand donors at a time, a large

13    percentage of which were paid donors. These large pools were then subjected to processes to

14    concentrate Factors VIII and IX.

15

16    B.    **Defendants Failed to Disclose or Warn of Serious Adverse Effects Associated with Factor Concentrates**

17            20.    Shortly after the initial commercial marketing of Factor VIII and IX

18    concentrates in the late 1960s to early 1970s, a wide range of serious adverse effects were

19    reported in association with these products. By that time, Defendants knew of serious diseases

20    caused by unidentified agents transmissible by blood and Factor VIII and IX. Defendants failed

21    to warn Plaintiff or the medical community of these adverse effects, violating industry standards

22    and federal regulations.

23            21.    By 1976, only a few years after Defendants' factor concentrate products

24    went on the market, the United States Food and Drug Administration ("FDA") Bureau of

25    Biologics held a conference titled *Unsolved Therapeutic Problems in Hemophilia*. The research

26    articles compiled from the conference discussed the high incidence of disorders in patients using

27    Defendants' products, such as liver dysfunction, enlarged spleen, Hepatitis B, and Non-A, Non-B

28    Hepatitis ("NANB Hepatitis," later renamed Hepatitis C). The articles concluded that these

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    disorders were tied to the patients' use of factor concentrates, and emphasized the risks entailed in

2    producing such concentrates using plasma from paid donors.  For instance, Robert Gerety of the

3    FDA Bureau of Biologics, Division of Blood and Blood Products, reported that the agent or

4    agents of NANB Hepatitis "appear to be blood borne, perhaps to be associated with a form of

5    chronic hepatitis, and to represent a considerable risk to recipients who repeatedly require the

6    administration of blood products." Gerety, et al., *Viral Antigens and Antibodies in People with*

7    *Hemophilia* (1977).  Gerety noted that "[t]he use of large plasma pools from paid donors no

8    doubt contributes to the risk of HBV [Hepatitis B] infection from these products," and stated that

9    "an all voluntary blood donor system is being pursued as a result of the known increased risk of

10   PTH [post-transfusion hepatitis] from blood derived from commercial donors." As described

11   below, however, Defendants not only refused to implement such a voluntary donor system, but

12   instead recruited paid donors precisely because their hepatitis exposure resulted in plasma from

13   which Defendants could make other commercially valuable products as well.

14                22.    At all times material to this Complaint, Defendants failed to adequately

15   warn Plaintiff or his physicians of the serious adverse side effects of their products.  Although

16   Defendants' package inserts mentioned a risk that plasma "may" contain the causative agent of

17   viral hepatitis, this warning was seriously deficient in that: (a) Defendants failed to disclose that

18   the risk of hepatitis was essentially a 100% guarantee due to their practices of using high-risk

19   donors and specifically recruiting for donors who had previously been exposed to Hepatitis B; (b)

20   while "hepatitis" simply means inflammation of the liver, and may be a relatively benign,

21   temporary condition, Defendants failed to warn that some forms of hepatitis transmitted by their

22   products were believed to present a considerable risk of severe liver damage and a significantly

23   elevated risk of liver cancer; (c) Defendants misleadingly stated that the source plasma used in

24   preparation of their products had been found to be non-reactive for Hepatitis B surface antigen

25   (HBsAg)—implying that no viral hepatitis was present in the plasma—and falsely stated that

26   available methods were not sensitive enough to detect all units of potentially infectious plasma,

27   failing to disclose that in fact Defendants had refused to implement the more sophisticated

28   Hepatitis B Core antibody (HBc) test which would have excluded the majority of plasma

1    contaminated by hepatitis; and (d) Defendants' labeling disclosed that their products were made

2    from large pools of fresh human plasma, but failed to disclose that paid donors increased the risk

3    of disease, and that the particular groups of paid donors targeted by Defendants were known to be

4    the highest risk groups.

5            23.    The demand for and supply of anti-hemophilic factor rapidly increased

6    during the 1970s, with commercially-manufactured concentrate accounting for a large proportion

7    of the increase in supply.  In 1977, a federal report projected that the volume of factor

8    concentrates manufactured would increase substantially by 1980.  Division of Blood Diseases and

9    Resources, National Heart, Lung and Blood Institute, *Study to Evaluate the Supply-Demand*

10   *Relationships for AHF and PTC Through 1980*, at page 8; hereinafter "NHLBI Report."

11           24.    In order to sell more factor concentrates to this growing market,

12   Defendants turned to the fastest and cheapest way of obtaining sufficient plasma, paid donors.

13   Defendants recruited paid donors from those populations most likely to respond to the financial

14   incentive to donate:  poor inner city residents, drug abusers, prisoners, and residents of

15   impoverished developing countries such as Haiti and Nicaragua.

16           25.    Defendants purposefully sought out paid donors despite knowing that the

17   risk of diseases transmissible by blood was far greater among paid donors than among volunteers.

18   Because no test was yet available in the 1970s for the NANB Hepatitis virus, an essential means

19   to prevent the virus from contaminating the plasma supply was to exclude donors with behaviors

20   that were inconsistent with good health—precisely those populations from which Defendants

21   were recruiting paid donors.  Some studies indicated that paid donors were up to ten times more

22   infectious than volunteer donors.  For this reason, the National Blood Policy, adopted by the

23   federal government in July 1973, advocated conversion to an all-volunteer blood supply.

24   Defendants, however, not only continued to use paid donors, but also focused their recruiting

25   efforts on the highest risk populations.

26           26.    Defendants had an additional financial incentive for recruiting paid donors.

27   Factor VIII and Factor IX are only two of many products that can be made for commercial sale

28   from human plasma.  According to the NHLBI Report, by the late 1970s at least 17 different

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   therapeutic components of blood were manufactured by the process of "fractionating" plasma into

2   its various elements.  The NHLBI Report noted that, "as the costs of fractionation have increased,

3   fractionators have produced as many products as possible from a liter of plasma." *Id.* at 65.

4          27.    Blood derivatives used as vaccines or therapeutics had particularly high

5   economic value for Defendants.  The NHLBI Report noted that plasma with a very high titer, or

6   antibody level, for a corresponding antigen is "very expensive." *Id.* at 41.  Such products are

7   manufactured from source plasma drawn from donors who have been sensitized to a particular

8   antigen.  *Id.*  The NHLBI Report specifically stated, however, that "plasma collected for high

9   antibody titer **cannot** be used for fractionation into therapeutic products," such as Defendants'

10  factor concentrate.  *Id.* (emphasis added).

11         28.    Defendants targeted donors with high titers to Hepatitis B antigens in order

12  to manufacture and sell Hepatitis B immunoglobulin (HBIG), a product that confers temporary

13  immunity to the Hepatitis B virus.  Despite the warning in the NHLBI report, Defendants used the

14  same high-titer plasma obtained for making HBIG to manufacture their Factor VIII and IX

15  products used by people with hemophilia.  Defendants thus sought to maximize profits by

16  producing "as many products as possible from a liter of plasma," while ignoring industry

17  standards that precluded the use of high-titer plasma for other therapeutic products.

18         29.    Beginning in about 1978, Defendants began targeting homosexual donors

19  in known urban gay communities.  Because urban homosexuals had been reported in the 1970s to

20  have exceptionally high prevalence of Hepatitis B infection, Defendants knew that such donors

21  would provide a reliable source of plasma for the manufacture of commercially valuable HBIG.

22         30.    By the 1970s, it was also well-known in the public health community that

23  urban homosexuals engaged in promiscuous sexual practices that rapidly transmitted other

24  diseases, including NANB Hepatitis, which were transmitted by blood and were believed to have

25  serious adverse consequences.  Despite this knowledge, Defendants used the same plasma pool

26  from urban homosexuals to manufacture both HBIG and Factor VIII and IX.

27         31.    By the 1970s, it was also well-established that plasma from prison

28  populations carried a high risk of hepatitis and other blood-borne diseases, primarily because of

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   the concentration of intravenous (IV) drug users in prisons. By 1974, the alanine

2   aminotransferase ("ALT") test was available to test for elevated levels of liver enzymes called

3   SGOT that indicate the presence of hepatitis. Prisoners were associated with SGOT levels of

4   over 60 IUs per ml, a level that increases the risk of Hepatitis C transmission by a factor of 6.

5   Despite knowledge of this risk, Defendants actively recruited prisoners for plasma used to

6   manufacture Factor VIII and IX, while concealing or failing to disclose the risk to Plaintiff, his

7   physicians, or the FDA.

8          32.    In light of Defendants' special knowledge of the disease patterns among

9   urban homosexuals and prisoners, and their recruitment of such donors for Factor VIII and IX

10  manufacture, Defendants had duties to: (a) discontinue the practice of using such high risk

11  donors; (b) disclose the risk to Plaintiff, his physicians, and the FDA, including the ongoing risk

12  of continuing to use Factor VIII and IX previously manufactured with high risk plasma and still

13  marketed to patients; (c) implement procedures to kill blood-borne diseases in the products; and

14  (d) recall existing products from distribution or further use. Instead, Defendants continued to

15  conceal their recruitment of high-risk donors and to resist warnings and recalls, and failed to

16  implement procedures to make their products safe.

17         33.    By no later than 1978, Defendants knew of the availability of a new test to

18  determine whether an individual had a history of viral hepatitis, which would have disqualified

19  the donor from providing plasma for the manufacture of Factor VIII or IX. By testing a person's

20  serum for the presence of the core to the Hepatitis B antibody, a history of viral hepatitis could be

21  verified. This was known as the "HBc test." Published, peer-reviewed literature shows that the

22  HBc test was in use by researchers to determine that homosexual AIDS victims had a history of

23  viral hepatitis by no later than December 1981. Gottlieb, et al., *Pneumocystis Carinii Pneumonia*

24  *and Mucosal Candidiasis in Previously Healthy Homosexual Men*, 305 New Eng. J. Med. 1425-

25  1431 (1981).

26         34.    Use of the HBc test would have eliminated approximately 75% of

27  homosexual plasma donors and over 90% of promiscuous urban homosexuals. It would have

28  eliminated almost 100% of intravenous drug users.

35.     Use of the HBc and ALT tests together by Defendants by 1981 would have eliminated the vast majority of the transmitters of HCV from the blood and plasma pools of the nation, before the height of the Hepatitis C epidemic.  If Defendants had implemented this test in a timely manner, Plaintiff more likely than not would not have been infected with HCV as a result of factor concentrate use.

36.     As noted below, federal regulations required plasma donors to be in good health, and donors with a "history of viral hepatitis" were by definition unacceptable as blood or blood plasma donors.  Persons with a history of viral hepatitis were excluded not only because of the risk of transmitting Hepatitis B, but because such a history indicated a lifestyle or previous behavior of the prospective donor that carried the risk of transmitting other viruses in addition to hepatitis.  A reasonable and prudent plasma fractionator would not accept a HBc positive donor and expect to be in compliance with federal regulations as of 1978.

37.     After public reports of the first hemophilia AIDS cases in July 1982, government officials urged Defendants to implement the HBc test as a "surrogate" or "marker" to eliminate plasma contaminated by the transmitter of AIDS and Hepatitis C.  HBc testing was also strongly suggested to Defendants by the CDC at a meeting of the United States Public Health Service ("PHS") on January 4, 1983.  Despite this urging, Defendants continued to use contaminated plasma donations that would have been excluded by the HBc test and continued to conceal from Plaintiff, his physicians, and the FDA the dangerous practice of targeting donors at highest risk for hepatitis.  At a January 6, 1983 meeting of Defendants' trade association, the Pharmaceutical Manufacturer's Association, Defendants agreed not to implement the highly effective HBc donor screening, and instead opted to use ineffective donor questionnaires that did little to screen out donors at high-risk for Hepatitis C transmission.

38.     As late as December 13, 1983, years after the HBc test was available, a memorandum from CUTTER's responsible head, Stephen Ojala, reporting back on a meeting held by Defendants, shows that Defendants conspired to propose a "task force" to further study the use of HBc as an intentional, bad faith "delaying tactic for the implementation" of the test.

C.  **Defendants Also Declined to Implement Available Treatment With Solvents and/or Detergents to Kill Blood-Borne Diseases, and Continued to Dump Contaminated Product on the Market After Safer Product Was Available**

39.   In the late 1970s and early 1980s, it was recognized that viruses were in all factor concentrate products.  Treatment with solvents and/or detergents was available at that time to eliminate many of these viruses, including HCV.  Defendants were required to take reasonable steps to eliminate contamination, but Defendants failed to utilize these available technologies to eliminate the viruses in a timely manner.

40.   Solvent and/or detergent treatment was available to Defendants by the late 1970s as a simple and effective method of eliminating viruses in factor concentrate products.  Solvents and/or detergents effectively kill viruses such as HCV by destroying the viruses' lipid envelope.  This method is simpler than heat treatment, and unlike heat treatment does not interfere with the Factor VIII and IX proteins needed for blood clotting.

41.   Solvents and/or detergents were well-known, commercially available products as of the 1970s, and studies in which solvent and/or detergent treatment was used to disrupt viruses were published in the 1970s in peer-reviewed journals.  In 1980, Dr. Edward Shanbrom, a former Baxter scientist, received a patent for a detergent treatment process for viral inactivation of factor concentrate.  Dr. Shanbrom describes the implementation of this process as "as easy as washing your hands."

42.   After receiving the patent, Dr. Shanbrom approached Defendants about implementing his method, but Defendants refused to heed Dr. Shanbrom's advice.  Defendants refused to even commit any resources to investigate the solvent and/or detergent method.

43.   Defendants were notified of the successful use of organic solvents to destroy lipid viruses, including NANB, in factor concentrates by the New York Blood Center ("NYBC") at the National Hemophilia Federation's meeting on October 27, 1983.

44.   In 1984, Dr. Prince and Dr. Horowitz of the NYBC published the results of their successful use of the solvent detergent process in well-known medical journals.  They

1  offered to license the process to Defendants for a reasonable fee. In 1985, the NYBC obtained a

2  license from the FDA to market a solvent detergent inactivated factor concentrate.

3        45. By March, 1984, Defendants obtained licenses to sell Factor VIII treated

4  with dry heat to inactivate viruses, and Defendants had obtained such licenses for Factor IX by

5  October, 1984. The FDA did not allow them to label these products as hepatitis safe. By fall of

6  1984, Defendants were notified by treaters that previously-untreated patients in their clinical trials

7  using their dry heated products developed elevated ALT enzymes, indicative of NANB

8  infections.

9        46. Defendants were therefore aware in 1984 that dry heat did not effectively

10 inactivate the virus that causes HCV, and that solvent detergent treatment methods did eliminate

11 the risk of HCV infection, but chose not to employ the effective and efficient solvent detergent

12 technology. Instead, Defendants continued to sell their contaminated dry heat product for at least

13 four more years, resulting in the needless infection of Plaintiff and many other hemophiliacs.

14       47. A recent CDC study documented the comparative effectiveness of the dry

15 heat and solvent detergent inactivation methods. The study reported that "84% of previously

16 untreated patients infused with dry-heated Factor VIII products developed non-A, non B

17 hepatitis… ." Soucie, Richardson, Evatt et al., *Risk Factor for Infection with HBV and HCV in a*

18 *Large Cohort of Hemophiliac Males*, 41 Transfusion 338-343 (2001).

19       48. The same CDC study reported that "solvent detergent treatment of blood

20 components [was] found to be more effective against enveloped viruses than heat treatment …

21 No cases of HBV, HCV, or HIV transmission through solvent detergent virus inactivated

22 products have been found in prospective studies of previously untreated patients..."

23       49. The study further reported "in our data, the first dramatic decline in HCV

24 prevalence appears in the 1987 birth cohort. The drop in HCV transmission correlates with the

25 licensing of solvent detergent treatment of Factor IX products in 1987. In addition, this cohort

26 would have been the first to benefit from the screening of blood donors using the surrogate

27 markers ALT (begun in late 1986) and anti-HBc (begun in 1987), testing that was associated with

28 a markedly decreased risk of HCV infection from blood transfusions."

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1        50.    The study states further that "the residual transmissions after 1987 possibly

2    represent the use of product already manufactured or product manufactured during the interval

3    required to implement the new technology.  The 18-month shelf life of factor concentrates placed

4    those people with hemophilia born as late as 1989 at risk of infection." The study goes on to

5    recommend testing for all people with hemophilia who received infusions of Defendants' blood

6    products prior to 1992.

7        51.    By 1988, it was clear to the medical and scientific community what

8    Defendants had long known: dry-heated factor concentrates were transmitting the potentially

9    deadly NANB virus, and safer products were available.  This knowledge prompted the CDC to

10    publish recommendations that dry-heated products no longer be used by hemophiliacs.

11    Defendants continued sales of their dry-heated products after these warnings, however, and never

12    undertook a large-scale recall of dry-heated product. Defendants finally introduced solvent

13    detergent-treated products to the market in 1988 and 1989, but continued to sell their NANB-

14    contaminated dry-heated factor concentrates after this date.

15        52.    The failure of Defendants to implement solvent and/or detergent viral

16    inactivation techniques in a timely manner, to warn of the risk that dry heat treated Factor VIII

17    and IX blood products could transmit HCV, and to recall dry heat-treated products that posed this

18    risk caused the needless infection of thousands of people with hemophilia with HCV, including

19    Plaintiff.  Even after Defendants knew or should have known that solvent and/or detergents

20    effectively destroyed HCV, they continued to sell dry heat-treated Factor VIII and IX, and

21    refused to recall these dangerous products from the market.

22

23    **D.    Defendants Fraudulently Misrepresented the Safety, and Concealed the
            Dangers, of Their Factor VIII and IX Products**

24        53.    Defendants engaged in a pattern and practice of fraudulent concealment of

25    their dangerous practices, fraudulent misrepresentations regarding their efforts to assure safety,

26    and fraudulent misrepresentations regarding the risk of Hepatitis C, in order to maintain profits

27    from both factor concentrates and HBIG.  A summary of Defendants' fraudulent

28    misrepresentations and concealment is set forth below.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

54.     On July 27, 1982, a meeting of the Public Health Service was held as the result of the CDC's report that three people with hemophilia had contracted AIDS. The responsible heads of Defendants were in attendance, along with officials from the National Hemophilia Foundation, CDC and FDA. Defendants were aware that they had used plasma from known, targeted homosexuals in the manufacture of their Factor VIII and IX blood products. These products had a shelf life of two years and were either in production or already on the shelves in pharmacies waiting to be infused by people with hemophilia who purchased them. Defendants failed to disclose these facts at the meeting where CDC officials were present, despite knowledge that the CDC's primary concern at that meeting was the contamination of Factor VIII and IX by the agent that transmitted AIDS, which, like hepatitis, was already well-known to be epidemic in the targeted homosexual population. (CUTTER memorandum dated August 3, 1982.)

55.     In or about December, 1982, Rodell, the responsible head for BAXTER, entered into an agreement with officials of the FDA to the effect that BAXTER would no longer use prison plasma in the production of factor concentrates. In fact, BAXTER, unbeknownst to the FDA, continued to use prison plasma in factor concentrate production through October 1983. BAXTER memorandum dated October 20, 1983.

56.     On January 5, 1983, an AIDS meeting was held at Children's Orthopedic Hospital in Los Angeles, California, the largest hemophilia treatment center in the United States. Representatives of Defendants were present at the meeting with treaters and patients. A patient asked representatives from Defendants the following question: "Is the plasma from homosexuals, prisoners, Haitians or other high risk persons being used in the manufacture of concentrates?" Defendants did not admit targeting or using plasma from homosexuals, prisoners or inner city IV drug abusers. Defendants' representatives made no response to the question, thereby concealing the true risk created by the use of plasma from known homosexuals, IV drug abusers and prisoners in the manufacture of factor concentrates.

57.     At the January 5, 1983 meeting, and in the presence of the patients, one of the treating physicians, Dr. Kasper, asked CUTTER's Stephen Ojala: "These [plasma] centers

1    seem to be in rundown centers of town. Is there a move to move them to rural towns?" Ojala

2    answered: "Many of the centers are in smaller communities and in towns such as Ypsilanti,

3    Seattle, Clayton, NC., and San Diego. We do not have centers in L.A. or San Francisco." This

4    answer was misleading because Ojala failed to state that CUTTER'S largest and first plasma

5    center was located at Arizona State Penitentiary. CUTTER also had a center at the Las Vegas

6    Prison. Ojala and CUTTER were well aware of the CDC's and FDA's concern over use of prison

7    plasma, due to homosexual practices and drug abuse in the prison donor population. Many of

8    CUTTER'S centers were in inner city areas frequented by IV drug abusers, such as downtown

9    Oakland, California. CUTTER had also used plasma from centers which targeted known

10   homosexuals. In August 1982, CUTTER quarantined plasma from the Valley Medical Center, a

11   center which targeted known homosexuals, because a donor was hospitalized with full blown

12   AIDS. The plasma was intended for factor concentrate and HBIG production, but was not used

13   because it had thawed on the way to the processing plant. Upon receiving a report of this incident

14   from CUTTER, the FDA indicated a recall might have been necessary if the plasma had been

15   incorporated into factor concentrate final product. Ojala omitted any mention of these facts and

16   circumstances in his response to Dr. Kasper regarding the location of their plasma centers.

17   (CUTTER memorandum dated January 5,1983.)

18         58.    On January 14, 1983, responsible heads from Defendants attended a

19   meeting of the National Hemophilia Foundation ("NHF"). Defendants were very concerned that

20   the NHF would insist on a recommendation that HBc testing be implemented, consistent with the

21   CDC recommendation 10 days earlier. In order to defer a NHF recommendation that HBc testing

22   be used, Michael Rodell, a representative of BAXTER, told NHF officials on behalf of

23   Defendants, that surrogate testing was in the "R and D," or "Research and Development," stage

24   currently. Rodell concealed the fact that the CDC had strongly recommended use of the HBc

25   antibody test as a screening device for high risk donors. The HBc antibody test was not in the "R

26   and D" stage, and was suitable for use as a screening device for high risk AIDS and Hepatitis C

27   donors. In fact, the HBc test had been approved in 1979 by the FDA as a test to be used to

28   ascertain a history of previous hepatitis B infection, and to screen blood and plasma donors.

1   Donors with a hepatitis history were specifically prohibited pursuant to the federal regulations (21

2   C.F.R. § 640.63). Rodell acknowledged that implementation of the HBc test would eliminate

3   high titered immunoglobulin donors, but failed to disclose that opposition to use of the test was

4   based on economic rather than safety concerns.

5           59.    At the January 14, 1983 meeting, Defendants concealed their advertising in

6   publications distributed among urban homosexuals, for the specific purpose of attracting them to

7   plasma centers which supplied high titered plasma to Defendants. Defendants also concealed

8   their extensive use of prison plasma, and failed to reveal their "gentlemen's agreement" with the

9   FDA to discontinue use of these plasma sources immediately. (CUTTER Memorandum dated

10  January 17, 1983.)

11          60.    On or about December 15, 1983, Rodell, then the head of Armour

12  Pharmaceutical Company, Inc., told members of the federal Blood Product Advisory Committee

13  (BPAC) and FDA officials that Defendants wanted a three-month deferral in implementation of

14  any recommendations by the BPAC or FDA that HBc testing be required for plasma donors.

15  Rodell told the FDA that the purpose of the deferral was to prepare a response to the proposed

16  recommendation. In fact, Defendants had agreed to seek the three-month hiatus as a "delaying

17  tactic" to avoid implementing the test, and the request for a deferral was made in bad faith.

18  (CUTTER memorandum dated December 13, 1983.)

19          61.    Defendants fraudulently misrepresented the risk of Hepatitis C due to

20  factor concentrates, failed to disclose accurate warnings of the risk to Plaintiff or his physicians,

21  and fraudulently purported to be doing "everything possible" to improve safety, when in fact

22  Defendants maximized the risk by recruiting high-risk donors and by resisting and obstructing

23  HBc testing, treatment with solvents and/or detergents, and other measures that would truly have

24  reduced the risk.

25  E.   **Defendants' Activities Were Subject to Applicable Federal Regulations,**
        **Which Evidence the Standard of Care With Which Defendants Should Have**
26      **Complied**

27          62.    Blood derivatives such as Factor VIII and IX are prescription biologicals

28  subject to federal regulation as both "biological products" and "drugs." Public Health Service

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   Act, "Regulation of Biological Products," 42 U.S.C. § 262; Food, Drug & Cosmetic Act

2   ("FDCA"), 21 U.S.C. § 301, *et seq.* *(2005).*

3            (a)     21 U.S.C. § 331(b) prohibited and continues to prohibit

4   "adulteration or misbranding of any ... drug . . . ."

5            (b)     21 U.S.C. § 351(a)(2)(B) provided and continues to provide that

6   "[a] drug . . . shall be deemed to be adulterated . . . if . . . the methods used in, or the facilities or

7   controls used for, its manufacture, processing, packing, or holding do not conform to or are not

8   operated or administered in conformity with current good manufacturing practice to assure that

9   such drug meets the requirements of this chapter as to safety. . . ."

10            (c)     21 U.S.C. § 352 provided and continues to provide that "[a] drug...

11   shall be deemed to be misbranded. .. if its labeling is false or misleading in any particular."

12            (d)     21 U.S.C. § 352(f)(2) provided and continues to provide that a drug

13   shall be deemed to be "misbranded" unless its labeling bears "adequate warnings against use. ..

14   where its use may be dangerous to health."

15            (e)     21 U.S.C. § 352(n) provided and continues to provide that a drug

16   shall be deemed to be "misbranded" unless the labeling included information concerning side

17   effects and contraindications as required in federal regulations.

18            (f)     21 U.S.C. § 321(n) provided and continues to provide that if an

19   article is alleged to be misbranded because the labeling or advertising is misleading, then the

20   determination of whether the labeling or advertising is misleading shall take into account "not

21   only representations made or suggested" by affirmative statements, "but also the extent to which

22   the labeling or advertising fails to reveal facts material in the light of such representations or

23   material with respect to consequences which may result from the use" of the drug.

24         63.     At all times material to this Complaint, 21 C.F.R. § 201.57(e) provided and

25   continues to provide as follows, with respect to information to be provided with the sale of

26   Defendants' products:

27           Warnings: Under this section heading, the labeling shall describe
serious adverse reactions and potential safety hazards, limitations in
use imposed by them, and steps that should be taken if they occur.

28           The labeling shall be revised to include a warning as soon as there

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1   is reasonable evidence of an association with a drug; a causal
    relationship need not have been proved.

2

3       64.     At all times material to this Complaint, 21 C.F.R. § 200.5 provided and

4   continues to provide as follows:

5           Manufacturers and distributors of drugs and the Food and Drug
            Administration occasionally are required to mail important
            information about drugs to physicians and others responsible for

6           patient care.  In the public interest, such mail shall be distinctive in
            appearance so that it will be promptly recognized and read.

7

8       65.     At all times material to this Complaint, Part 606 of 21 C.F.R. set forth and

9   continues to set forth "Current Good Manufacturing Practices" for biological products generally,

10  and 21 C.F.R. § 640, et seq., set forth additional good manufacturing practices for blood and

11  plasma biologicals.

12      66.     At all times material to this Complaint, 21 C.F.R. § 606.140(a) provided

13  and continues to provide:

            Laboratory control procedures shall include: The establishment of

14          scientifically sound and appropriate specifications, standards and
            test procedures to assure that blood and blood components are safe,

15          pure, potent and effective.

16

17      67.     At all times material to this Complaint, 21 C.F.R. § 640.60 defined and

    continues to define "Source Plasma" as:

18          the fluid portion of human blood collected by plasmapheresis, and
            is intended as source material for further manufacturing use.

19

20      68.     At all times material to this Complaint, 21 C.F.R. § 640.63(c), (1999),

21  titled "Qualification of Donor," provided and continues to provide as follows with respect to

22  donors of source plasma:

            Donors shall be in good health on the day of donation, as indicated

23          in part by: . . . (9) freedom from any disease, other than malaria,
            transmissible by blood transfusion, in so far as can be determined

24          by history and examination indicated in this section; (10) freedom
            of the arms and forearms from skin punctures or scars indicative of

25          addiction to self-injected narcotics; (11) freedom from a history of
            viral hepatitis; (12) freedom from a history of close contact within

26          six months of donation with an individual having viral
            hepatitis; . . . .

27

28

1  Further, 21 C.F.R. § 640.63(a) provided and continues to provide that the method of determining

2  "suitability of a donor" included "tests" as well as the taking of a history and physical

3  examination.

4          69.    The foregoing statutes and regulations are evidence of the standard of care

5  Defendants should have employed in the manufacture and sale of Factor VIII and Factor IX.

6  Defendants violated the foregoing regulations and/or failed to comply with applicable standards

7  of care by:  (a) marketing "adulterated" products that were unsafe as a result of failure to comply

8  with "Current Good Manufacturing Practice"; (b) marketing "misbranded" products that were

9  misleading and failed to disclose or warn of health dangers; (c) failing to warn of serious adverse

10  reactions and potential safety hazards as soon as there was reasonable evidence of an association

11  with their products; (d) failing to exclude intravenous drug users who were unsuitable donors;

12  (e) failing to exclude donors with a history of viral hepatitis who were unsuitable donors;

13  (f) affirmatively seeking out unsuitable donors known to have viral hepatitis antibodies, as well as

14  prison populations known to include substantial numbers of intravenous drug users, for inclusion

15  of their plasma in the pools used to make Factor VIII and Factor IX; (g) failing to disclose their

16  use of dangerous donors; and (h) failing to use appropriate tests and/or procedures to assure their

17  products were safe.

18      F.    **Group Liability**

19          70.    All Defendants likely to have caused the harm to Plaintiff are parties to this

20  lawsuit and properly before the court.

21          71.    The conduct of Defendants, with respect to their Factor VIII and Factor IX

22  products and related plasma collection methods, was tortious.

23          72.    The harm which has been caused to Plaintiff resulted from the conduct of

24  one, or various combinations of the Defendants, and, through no fault of Plaintiff, there may be

25  uncertainty as to which one or combination of Defendants caused the harm.

26          73.    The burden of proof should be upon each Defendant to prove that the

27  Defendant has not caused the harms suffered by the Plaintiff.

28          74.    Factor concentrates were manufactured using the same fractionation

1    method by all Defendants. As such, during the relevant years, factor concentrates were a fungible

2    product, and physicians prescribed the products interchangeably without regards to brand names.

3          75.    The factor concentrates manufactured by Defendants contained the same

4    design flaws. They were all manufactured from paid donor plasma, which was at highest risk for

5    Hepatitis B and Hepatitis C viral transmission. In addition, all Defendants' factor concentrates

6    were made from large pools consisting of 5,000 to over 20,000 paid donors, which further

7    magnified the risk of viral transmission.

8          76.    None of the factor concentrates made by Defendants during the relevant

9    time period were subjected to viral inactivation processes such as solvent and/or detergent

10    treatment that were effective against HCV. Therefore, all of Defendants' factor concentrates

11    carried a significant risk of HCV transmission during this time. In addition, all of Defendants'

12    factor concentrate products were similarly misbranded. All of the products failed to warn of the

13    known risks enumerated in this complaint.

14    **V.    TOLLING OF APPLICABLE STATUTES OF LIMITATION**

15          77.    Any and all potentially applicable statutes of limitations have been tolled

16    by Defendants' affirmative and intentional acts of fraudulent conduct, concealment, and

17    misrepresentation, alleged above, which estop Defendants from asserting statutes of limitation.

18    Such acts include but are not limited to intentionally covering up and refusing to disclose use of

19    high-risk plasma; selling products known to be contaminated; suppressing and subverting medical

20    and scientific research; and failing to disclose and suppressing information concerning the risk of

21    HCV transmission from Defendants' contaminated factor concentrates.

22          78.    Defendants are estopped from relying on any statutes of limitation because

23    of their fraudulent concealment and misrepresentation alleged above. Defendants were under a

24    duty to disclose the precise risks of HCV transmission from their contaminated factor concentrate

25    because this is nonpublic information over which they had exclusive control, because Defendants

26    knew this information was not readily available to people with hemophilia like Plaintiff, and

27    because this information was relevant to such people in deciding whether to use Defendants'

28    factor concentrate.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    79.    Until very recently, Plaintiff had no knowledge that Defendants were

2  engaged in much of the wrongdoing alleged herein.  Because of the fraudulent and active

3  concealment of the wrongdoing by Defendants, including but not limited to deliberate efforts—

4  which continue to this day—to give Plaintiff the materially false impression that Defendants

5  undertook all feasible safety precautions to reduce the risk of HCV transmission from their

6  contaminated factor concentrates, Plaintiff could not reasonably have discovered the wrongdoing

7  any time prior to this time, nor could Plaintiff have, as a practical matter, taken legally effective

8  action given the unavailability, until very recently, of internal memoranda and other documents

9  (as generally described herein) as evidence in support of Plaintiff's claims.  Defendants still

10  refuse to admit and continue to conceal their wrongdoing, and therefore Defendants' acts of

11  fraudulent concealment and misrepresentation continue through the present time.

12  VI.    **CLAIMS FOR RELIEF**

13                          **FIRST CLAIM FOR RELIEF**

14                     **FRAUDULENT OMISSION AND CONCEALMENT**

15    80.    Plaintiff incorporates by reference all previous paragraphs of this

16  Complaint as if fully set forth here and further alleges as follows:

17    81.    Defendants had a confidential and special relationship with Plaintiff due to:

18  (a) Defendants' vastly superior knowledge of the health and safety risks relating to Factor VIII

19  and Factor IX; (b) Defendants' sole and/or superior knowledge of their dangerous and

20  irresponsible plasma collection practices; and (c) Defendants' direct communications with the

21  hemophiliac community through newsletters that purported to accurately convey the risk of

22  NANB.  As a result, Defendants had an affirmative duty to fully and adequately warn the

23  hemophiliac community, including Plaintiff, his guardians, and his physicians, of the true health

24  and safety risks related to their Factor VIII and Factor IX blood products and constituent plasma,

25  and a duty to disclose their dangerous and irresponsible plasma collection practices.  Independent

26  of any special relationship of confidence or trust, Defendants had a duty not to conceal the

27  dangers of their products to Plaintiff, his guardians, and his physicians.

28

- 22 -
750361.1

86.    As a direct and proximate result of Defendants' fraudulent concealment and suppression of material health and safety risks relating to their Factor VIII and Factor IX blood products and of Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has suffered and will continue to suffer injury, harm and economic loss.  As the direct, proximate and legal result of the Defendants' fraudulent concealment and suppression of material health and safety risks relating to their Factor VIII and Factor IX blood products and of Defendants' dangerous and irresponsible plasma collection practices, Plaintiff has been injured and has incurred damages, including but not limited to physical injuries to his person, medical expenses in the past, past disability, past loss of use of the body, and past physical and mental pain and suffering; and may incur in the future medical and hospital expenses, permanent disability, loss of use of the body, physical and mental pain and suffering, and loss of the enjoyment of life.

87.    Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

88.    Defendants' conduct, as alleged above, was malicious, intentional and outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

89.    Plaintiff is informed and believes that Defendants utilize retention policies that provide for scheduled destruction of documents and other items, which may result in the knowing, negligent, or inadvertent destruction of documents, data, and materials relevant and necessary to adjudication of this action, including, but not limited to, records identifying batch or lot numbers of Defendants' products shipped to particular treatment facilities, which may facilitate product tracing.  This risk warrants an order from this Court that such evidence (including all documents, data compilations, and tangible things within the meaning of Rule 26 of the Federal Rules of Civil Procedure) be preserved and maintained for use in these proceedings.

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

82. Misrepresentations made by Defendants about the health and safety of their factor concentrate products independently imposed a duty upon Defendants to fully and accurately disclose to the hemophiliac community, including Plaintiff, his guardians, and his physicians, the true health and safety risks related to Factor VIII and Factor IX and its constituent plasma, and a duty to disclose their dangerous and irresponsible plasma collection practices.

83. In connection with their Factor VIII and Factor IX products, Defendants fraudulently and intentionally concealed important and material health and safety product risk information from Plaintiff, his guardians, the hemophiliac community, and treating physicians, all as alleged in this Complaint.

84. Any of the following is sufficient to independently establish Defendants' liability for fraudulent omission and/or concealment:

a. Defendants fraudulently concealed the health and safety hazards, symptoms, diseases and/or health problems associated with their Factor VIII and Factor IX blood products and related plasma collection activities;

b. Defendants fraudulently concealed the practice of using unsuitable plasma from unsuitable donors in the manufacture of their Factor VIII and Factor IX blood products;

c. Defendants fraudulently concealed their practice of avoiding the use of available technology to detect viruses in their Factor VIII and Factor IX blood products and the components thereof;

d. Defendants fraudulently concealed their practice of avoiding the use of available technology to destroy viruses in their Factor VIII and Factor IX blood products and the components thereof; and/or

e. Defendants fraudulently concealed information about the known comparative risks and benefits of the use of their Factor VIII and Factor IX and the relative benefits and availability of alternate products and therapies.

85. Defendants knew that Plaintiff, his guardians, the hemophiliac community, and physicians would regard the matters Defendants concealed to be important in determining a course of treatment, including the decision whether to use their Factor VIII and/or Factor IX blood products.

**SECOND CLAIM FOR RELIEF**

**BREACH OF IMPLIED WARRANTY**

90.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

91.     Defendants' factor concentrate products were intentionally designed, manufactured, promoted, distributed and sold to be introduced into the human body.

92.     Defendants breached the implied warranties of merchantability and fitness, because Defendants' factor concentrate products cannot pass without objection in the trade, are unsafe, are not merchantable, are unfit for their ordinary use when sold, and are not adequately packaged and labeled.

93.     Plaintiff is therefore entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

**THIRD CLAIM FOR RELIEF**

**NEGLIGENCE**

94.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth here and further alleges as follows:

95.     Defendants marketed their Factor VIII and/or Factor IX blood products to and for the benefit of Plaintiff, and knew or should have known that Plaintiff would use their Factor VIII and/or Factor IX blood products.

96.     Defendants owed Plaintiff duties to exercise reasonable or ordinary care under the circumstances in light of the generally recognized and prevailing best scientific knowledge.

97.     Through the conduct described in the foregoing and subsequent paragraphs of this Complaint, Defendants breached their duties to Plaintiff. The following sub-paragraphs summarize Defendants' breaches of duties to Plaintiff and describe categories of acts or omissions constituting breaches of duties by Defendants. Each and/or any of these acts or omissions establishes an independent basis for Defendants' liability in negligence:

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

a.   Failure to exercise reasonable care in producing Factor VIII and Factor IX blood products that were free of viruses, including the virus that causes Hepatitis C;

b.   Failure to exercise reasonable care in assuring that only suitable plasma would be used in manufacturing their Factor VIII and Factor IX blood products;

c.   Failure to exercise reasonable care in testing plasma used in manufacturing their Factor VIII and Factor IX blood products for viral contamination;

d.   Failure to exercise reasonable care in recruiting and screening donors of plasma used in their manufacture of Factor VIII and Factor IX blood products;

e.   Failure to reasonably employ anti-viral techniques, including solvent and/or detergent treatment, in the manufacture of their Factor VIII and Factor IX blood products;

f.   Unreasonable overpromotion of their Factor VIII and Factor IX blood products;

g.   Understating the relative value of hemophilia treatments that constituted alternatives to their Factor VIII and Factor IX blood products;

h.   Failure to warn physicians, Plaintiff, his guardians, and the hemophilia community of the dangers associated with their Factor VIII and Factor IX blood products and/or the viruses and foreign bodies contained within the plasma used in manufacturing their Factor VIII and Factor IX blood products;

i.   Failure to exercise reasonable care by complying with federal regulations then applicable to plasma collection and the manufacture of Factor VIII and Factor IX blood products;

j.   Failure to exercise reasonable care in disseminating information about their methods of manufacturing their Factor VIII and Factor IX blood products and the risks that were created by said methods; and

k.   Failure to exercise reasonable care in recalling their Factor VIII and Factor IX blood products.

98.   Defendants knew, or should have known, that due to their failure to use reasonable care, Plaintiff and other people with hemophilia would use and did use Defendants' Factor VIII and/or Factor IX products to the detriment of their health, safety and well-being.

99.   As the direct, proximate and legal result of the Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not limited to physical injuries

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1    to his person, medical expenses in the past, past disability, past loss of use of the body, and past

2    physical and mental pain and suffering; and may incur in the future medical and hospital

3    expenses, permanent disability, loss of use of the body, physical and mental pain and suffering,

4    and loss of the enjoyment of life.

5           100.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

6    together with interest thereon and costs.

7           101.    Defendants' conduct, as alleged above, was malicious, intentional and

8    outrageous, and constituted willful and wanton disregard for the rights or safety of others.  Such

9    conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

10                          **FOURTH CLAIM FOR RELIEF**

11                             **NEGLIGENCE PER SE**

12          102.    Plaintiff incorporates by reference all previous paragraphs of this

13   Complaint as if fully set forth here and further alleges as follows:

14          103.    Defendants violated applicable federal statutes and regulations relating to

15   prescription drugs.  Plaintiff is a person whom these statutes and regulations were meant to

16   protect.

17          104.    Defendants' violation of these statutes or regulations constitutes negligence

18   per se.

19          105.    Defendants' violation of these statutes or regulations was the direct,

20   proximate and legal cause of Plaintiff's injuries and damages.  As the direct and legal result of the

21   Defendants' negligence, Plaintiff has been injured and has incurred damages, including but not

22   limited to physical injuries to his person, medical expenses in the past, past disability, past loss of

23   use of the body, and past physical and mental pain and suffering; and may incur in the future

24   medical and hospital expenses, permanent disability, loss of use of the body, physical and mental

25   pain and suffering, and loss of the enjoyment of life.

26          106.    Plaintiff is therefore entitled to damages in an amount to be proven at trial,

27   together with interest thereon and costs.

28

1       107.   Defendants' conduct, as alleged above, was malicious, intentional and

2   outrageous and constituted willful and wanton disregard for the rights or safety of others.  Such

3   conduct was directed specifically at Plaintiff and warrants an award of punitive damages.

4   **VII.   PRAYER FOR RELIEF**

5       WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

6       108.   For compensatory damages sustained by Plaintiff against Defendants in an

7   amount to be determined at trial;

8       109.   For punitive and exemplary damages according to proof against

9   Defendants;

10      110.   For an award of prejudgment interest, costs, disbursements and reasonable

11  attorneys' fees;

12      111.   For injunctive relief in the form of an order requiring Defendants to

13  preserve all relevant documents; and

14      112.   For such other and further relief as the Court deems equitable or

15  appropriate under the circumstances.

16

17

Dated: February 22, 2008

18   _____
     Elizabeth J. Cabraser

19   Elizabeth J. Cabraser (California Bar No. 83151)
20   Heather A. Foster (California Bar No. 184353)
     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
21   275 Battery Street, 30th Floor
     San Francisco, CA  94111-3339
     Telephone:  (415) 956-1000
22   Facsimile:  (415) 956-1008
     E-mail: ecabraser@lchb.com, rheimann@lchb.com,
23           hfoster@lchb.com

24                   -and-

25   Steven E. Fineman (California Bar No. 140335)
     Paulina do Amaral (California Bar No. 196757)
26   Nicholas Diamand
     LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
27   780 Third Avenue, 48th Floor
     New York, NY 10017-2024
28   Telephone: (212) 355-9500

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1

Facsimile: (212) 355-9592
E-mail: sfineman@lchb.com; pdoamaral@lchb.com;

2

ndiamand@lchb.com

3

-and-

4

Lexi J. Hazam (California Bar No. 224457)
LIEFF GLOBAL, LLP

5

275 Battery Street, 30th Floor
San Francisco, CA 94111

6

Telephone: (415) 788-8000
Facsimile: (415) 788-8002

7

E-mail: lhazam@lieffglobal.com

8

Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF

1
## DEMAND FOR JURY TRIAL

2

3
Plaintiff demands a trial by jury on all issues stated.

4
Dated:  February 22, 2008                    _____

5                                                         Elizabeth J. Cabraser

6
Elizabeth J. Cabraser (California Bar No. 83151)
Heather A. Foster (California Bar No. 184353)
7
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
8
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
9
Facsimile:  (415) 956-1008
E-mail: ecabraser@lchb.com, rheimann@lchb.com,
10
    hfoster@lchb.com

11
                                                -and-

12
Steven E. Fineman (California Bar No. 140335)
Paulina do Amaral (California Bar No. 196757)
13
Nicholas Diamand
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
14
780 Third Avenue, 48th Floor
New York, NY 10017-2024
15
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
16
E-mail: sfineman@lchb.com; pdoamaral@lchb.com;
ndiamand@lchb.com
17

18
                                                -and-

19
Lexi J. Hazam (California Bar No. 224457)
LIEFF GLOBAL, LLP
20
275 Battery Street, 30th Floor
San Francisco, CA  94111
21
Telephone: (415) 788-8000
Facsimile: (415) 788-8002
22
E-mail: lhazam@lieffglobal.com

23
Attorneys for Plaintiff

24

25

26

27

28

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF